Denis LUKES and West Penn Allegheny Health System, Petitioners

v.

DEPARTMENT OF PUBLIC WELFARE, Respondent.

Commonwealth Court of Pennsylvania.

Argued Oct. 14, 2008.

Decided June 3, 2009.

Reargument Denied Aug. 13, 2009.

Charles Kelly, Pittsburgh, for petitioners.

Leonard W. Crumb, Asst. Counsel, Harrisburg, for respondent.

Susan A. Yohe and Brian H. Simmons, Pittsburgh, for intervenors, University of Pittsburgh Medical Center, UPMC Health Plan Inc. and UPMC for You, Inc.

BEFORE: McGINLEY, Judge and COHN JUBELIRER, Judge, and KELLEY, Senior Judge.

OPINION BY Senior Judge KELLEY.

Denis Lukes (Lukes) and West Penn Allegheny Health System (WPAHS) (collectively, Petitioners) petition for review of an order of the order of the Chief Administrative Law Judge (CALJ) of the Department of Public Welfare's (DPW) Bureau of Hearings and Appeals (Bureau), which denied Petitioners' exceptions from a DPW decision denying Petitioners' request for information under what was commonly referred to as the Right–to–Know Law (Law)[1]. We reverse.

I. *INTRODUCTION*

Lukes is the Vice President of Finance of WPAHS, which is a non-profit healthcare provider comprised of six hospitals located in western Pennsylvania. On April 4, 2007, Petitioners submitted a written right-to-know request with DPW. The right-to-know request sought the production of Provider Agreements between the University of Pittsburgh Medical Center Health Plan, Inc. (Health Plan) and hospitals affiliated with the University of Pittsburgh Medical Center (UPMC)[2] entered into for the purpose of administering a DPW Medicaid managed care program known as the HealthChoices Program. DPW denied the request. Petitioners filed exceptions with the Bureau and requested a hearing. The Health Plan intervened. An evidentiary hearing was held before the Bureau, with the Bureau's CALJ presiding.

II. *FACTS*

Based upon the testimony and evidence presented at the hearing, the CALJ made the following relevant findings. The Health Plan, which is a separate corporation from UPMC, is a managed care organization (MCO) and operates a Medicaid Health Maintenance Organization (HMO) separately incorporated as UPMC for You, Inc. The Health Plan is not an agency of the Commonwealth. The right-to-know request was sufficiently specific to enable the agency to ascertain which records were being requested; the documents requested exist and are in the possession of the Health Plan.

DPW is an agency of the Commonwealth and the single state agency responsible for administering the Commonwealth's Medical Assistance (also referred to as Medicaid) program. The Medical

---

**1.** Act of June 21, 1957, P.L. 390, *as amended,* formerly 65 P.S. §§ 66.1–66.9. Of particular relevance to this proceeding are the amendments created by the Act of June 29, 2002, P.L. 663 ("Act 100"), which took effect on December 29, 2002. These sections have since been repealed and replaced by the Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101–67.3104 (referred to herein as the "New Right–to–Know Law"), the bulk of which took effect on January 1, 2009. The sections of the Law referenced in this Opinion reflect the text of the repealed law, which was in existence at the time the request was made and the suit was filed.

**2.** UPMC is comprised of the following ten hospitals located in Western Pennsylvania: UPMC Presbyterian, UPMC Shadyside, UPMC Braddock, UPMC McKeesport, UPMC Passavant, UPMC South Side, UPMC St. Margaret, Children's Hospital of Pittsburgh of UPMC, Magee–Women's Hospital of UPMC, and Western Psychiatric Institute and Clinic.

Assistance program is a cooperative federal-state program through which various healthcare services are provided to those who qualify. The HealthChoices Program is the Commonwealth's managed care program for Medical Assistance recipients. DPW administers the HealthChoices Program through a series of HealthChoices Agreements with Medicaid MCOs and/or Medicaid HMOs. Pursuant to these contracts, the Health Plan agrees to pay the providers negotiated rates for medical services rendered to Medicaid MCO/HMO recipients.

On July 1, 2006, DPW entered into a HealthChoices Agreement with the Health Plan to participate as a Medicaid MCO. DPW agreed to make payments to the Health Plan using per member month rates. The Health Plan, in turn, administers benefits to Medicaid enrollees. The Health Plan agreed to enroll Medical Assistance recipients as members and to provide medically necessary services to those members. The Health Plan had separate Provider Agreements with different hospitals to provide those services to Medicaid recipients; ten of these hospitals are subject to Petitioners' right-to-know request. The Health Plan entered into contracts with only two of the six WPAHS hospitals.

The HealthChoices Agreement between DPW and the Health Plan states that "the relationship between DPW and the Contractor is that of independent contracting parties. The Contractors, its employees, services, agents, and representatives shall not be considered and shall not hold themselves out as the employees, servants, agents or representatives of the Department or the Commonwealth of Pennsylvania." Reproduced Record (R.R.) at 488a. The HealthChoices Agreement does not require the Health Plan to enter into contracts with any particular healthcare providers or require the Health Plan to pay any particular rates to its healthcare providers.

Pursuant to the HealthChoices Agreement, DPW pays the Health Plan a periodic capitation payment for each Medical Assistance recipient enrolled as a member of the Health Plan, whether or not the recipient actually received services during the period covered by the fee. The capitation payments are paid to the Health Plan to manage and pay for medical services and products for Medicaid enrollees. The payments made by DPW to the Health Plan are public funds. If the Health Plan was able to control costs within the level of the capitation revenue, then it would earn a profit; if not, the Health Plan would suffer a loss. The Health Plan used money it received from DPW to pay UPMC provider hospitals. The Health Plan operates its Medicaid MCO through the receipt of public and private funds, which are commingled in one account. DPW does not require segregation of capitation payments from other funding sources. Once the funds are commingled, it is impossible to determine what sources of funds paid for what expenses and/or services under the HealthChoices Agreement with DPW.

The Health Plan's Provider Agreements contain specific payment rates as well as confidentiality provisions forbidding the release of information contained therein. UPMC and the Health Plan require all employees to sign confidentiality agreements forbidding disclosure of confidential information to outside parties. The rates paid by Medicaid HMO/MCOs to providers affect the capitation payments DPW would make to the Medicaid HMO/MCOs in future years. Higher rates paid by Medicaid HMO/MCOs to its provider hospitals correlates into higher capitation payments made by DPW to Medicaid HMO/MCOs. Higher rates paid by Medicaid HMO/MCOs to its provider hospitals would in-

crease the cost of the Medicaid program to DPW and the taxpayers of Pennsylvania.

Pursuant to the HealthChoices Agreement, DPW has the right to demand to see copies of the Provider Agreements. The Agreement also imposes a records retention policy upon the Health Plan. DPW can require the Health Plan to make available to DPW all subcontracts within five (5) days of a request. DPW has never possessed or requested the Provider Agreements between the Health Plan and their provider hospitals.

## III. *DETERMINATION*

Based upon these findings, the CALJ determined that Lukes is the sole appellant; Lukes never established Pennsylvania residency and is therefore not eligible to seek public records under the Law. The CALJ further determined that the Provider Agreements are not public records because they are not "maintained" by DPW as required by the Law and because the Health Plan was not acting as an agent of DPW by paying its hospital providers for services rendered to Medicaid recipients; the Health Plan did not use public funds to pay its Medicaid service providers. Assuming the Provider Agreements are public records, the CALJ determined that the Provider Agreements contain information protected under Pennsylvania's Uniform Trade Secrets Act (Trade Secrets Act)[3] and are protected from disclosure under the Law.

■ By final order dated December 6, 2007, the CALJ affirmed DPW's denial of the right-to-know request and denied the

exceptions. Petitioners then filed the instant appeal.[4] UPMC, the Health Plan, and UPMC For You, Inc. (collectively, Intervenors) have intervened.

## IV. *ISSUES*

On appeal, Petitioners have raised the following questions for our review:

1. Whether Petitioners have standing to seek public records under the Law.

2. Whether an agency must have immediate, physical possession of a record in order to be required to produce it under the Law.

3. Whether an agency and a private entity must have a formal agency relationship in order for documents in the private entity's possession to be deemed public records under the Law.

4. Whether an agency can transform public funds into private funds by transmitting them to a private entity for disbursement.

5. Whether contracts between a Medicaid MCO and hospitals with which it contracts regarding the use of public funds can be withheld based on an assertion that they may contain protectable trade secrets.

## V. *DISCUSSION*

### 1. *STANDING*

Petitioners assert that they have standing to seek public records under the Law and that the CALJ erred by raising the issue of residency *sua sponte.* We agree.

---

**3.** 12 Pa.C.S. §§ 5301–5308.

**4.** This Court's review in a right-to-know case is limited to whether an error of law was committed, constitutional rights were violated or whether necessary findings of fact are supported by substantial evidence. *Digital–Ink,*

*Inc. v. Department of General Services,* 923 A.2d 1262 (Pa.Cmwlth.), *petition for allowance of appeal denied,* 594 Pa. 706, 936 A.2d 41 (2007); *Goppelt v. City of Philadelphia Revenue Department,* 841 A.2d 599 (Pa. Cmwlth.2004).

■ Our Supreme Court has consistently held that a court is prohibited from raising the issue of standing *sua sponte. In re Nomination Petition of deYoung,* 588 Pa. 194, 201, 903 A.2d 1164, 1168 (2006) (specifically abrogating *Beverly Healthcare–Murrysville v. Department of Public Welfare,* 828 A.2d 491 (Pa.Cmwlth. 2003), where we held that standing can be raised by the Court *sua sponte* if it is intertwined with subject matter jurisdiction.); *see In re A.P.,* 589 Pa. 281, 908 A.2d 284 (2006); *Payne v. Department of Corrections,* 582 Pa. 375, 386 n. 5, 871 A.2d 795, 802 n. 5 (2005); *Hertzberg v. Zoning Board of Adjustment,* 554 Pa. 249, 256 n. 6, 721 A.2d 43, 46 n. 6 (1998). Subject matter jurisdiction concerns "the competency of the court to determine controversies of the general class to which the case presented for its consideration belongs." *deYoung,* 588 Pa. at 201, 903 A.2d at 1168 (quoting *Heath v. Workers' Compensation Appeal Board,* 580 Pa. 174, 180–81, 860 A.2d 25, 29 (2004); *Strank v. Mercy Hospital of Johnstown,* 376 Pa. 305, 309, 102 A.2d 170, 172 (1954)). "Whether a party has standing to maintain an action is not a jurisdictional question." *deYoung,* 588 Pa. at 201, 903 A.2d at 1168 (quoting *Beers v. Unemployment Compensation Board of*

*Review,* 534 Pa. 605, 611 n. 6, 633 A.2d 1158, 1160 n. 6 (1993)). Consequently, the CALJ in the instant case erred in raising and addressing the issue of standing on its own accord.[5]

## 2. *RECORD*

■ Petitioners contend that the CALJ erred by holding that an agency must have immediate, physical possession of a record in order to be required to produce it under the Law. We agree.

Section 2 of the Law, 65 P.S. § 66.2, provides that "[e]very public record of an agency shall, at reasonable times, be open for examination and inspection by any citizen of the Commonwealth of Pennsylvania." Section 3 of the Law, 65 P.S. § 66.3, provides "[a]ny citizen of the Commonwealth of Pennsylvania shall have the right to take extracts or make copies of public records...." The term "agency" refers to "[a]ny office, department, board or commission of the executive branch of the Commonwealth, any political subdivision of the Commonwealth, ... or similar organization created by or pursuant to a statute which declares in substance that such organization performs or has for its purpose

---

**5.** DPW concedes that the CALJ erred as a matter of law by raising the issue of standing *sua sponte.* DPW's brief at 12. The Intervenors did not address the issue in their brief. Even if the issue of standing was properly raised, we believe that Petitioners were entitled to request the documents and demonstrated standing to appeal the denial of their request. Section 1 of the Law, 65 P.S. § 66.1, defines "requester" as any "person who is a resident of the Commonwealth and requests a record pursuant to this act." The term "person" is not limited to individuals. *See Tribune–Review Publishing Co. v. Bodack,* 599 Pa. 256, 961 A.2d 110 (2008) (request by publishing company); *Digital–Ink* (request by corporation); *see also Sapp Roofing Co., Inc. v. Sheet Metal Workers' International Association,* 552 Pa. 105, 713 A.2d 627 (1998) (re-

quest by union); *Tapco, Inc. v. Township of Neville,* 695 A.2d 460 (Pa.Cmwlth.1997) (request by corporation).

Contrary to the CALJ's finding that Lukes is the sole appellant, a review of the record reveals that the written request was made by Lukes on behalf of WPAHS. R.R. at 1350a; *see* R.R. at 1239a. The exceptions to DPW's refusal were filed on behalf of WPAHS. R.R. at 2–6. The record also reveals that WPAHS's headquarters is located in Pittsburgh, Pennsylvania. R.R. at 1350a. WPAHS's office address has been of record since the filing of the original request. *Id.* As a result, Petitioners clearly established that WPAHS was entitled to make a right-to-know request and had standing to appeal the denial under the Law.

the performance of an essential governmental function." DPW is an "agency" of the Commonwealth for purposes of the Law.

■ A party asserting a right to disclosure of documents pursuant to the Law must establish that the requested documents are "public records." *Safety, Agriculture, Villages and Environment, Inc. v. Delaware Valley Regional Planning Commission,* 819 A.2d 1235 (Pa.Cmwlth.2003). Pursuant to Section 1 of the Law, 65 P.S. § 66.1, a "public record" is defined as:

Any account, voucher or **contract dealing with the receipt or disbursement of funds by an agency** or its acquisition, use or disposal of services or of supplies, materials, equipment or other property and any minute, order or decision by an agency fixing the personal or property rights, privileges, immunities, duties or obligations of any person or group of persons: Provided, That the term "public records" shall not mean any report, communication or other paper, the publication of which would disclose the institution, progress or result of an investigation undertaken by an agency in the performance of its official duties, except those reports filed by agencies pertaining to safety and health in industrial plants; it shall not include any record, document, material, exhibit, pleading, report, memorandum or other paper, access to or the publication of which is prohibited, restricted or forbidden by statute law or order or decree of court, or which would operate to the prejudice or impairment of a person's reputation or personal security, or which would result in the loss by the Commonwealth or any of its political subdivisions or commissions or State or municipal authorities of Federal funds, excepting therefrom however the record of any conviction for any criminal act.

(Emphasis added). Act 100 added a separate definition for "record" to the Law. A "record" is defined as "[a]ny document *maintained by an agency,* in any form, whether public or not." Section 1 of the Law, 65 P.S. § 66.1 (emphasis added). Unfortunately, the word "maintain" is not defined by the Law.

When a word is not defined by the statute, it must be interpreted in accordance with its ordinary usage. Section 1903(a) of the Statutory Construction Act of 1972 (Statutory Construction Act), 1 Pa.C.S. § 1903(a). In ascertaining the common and approved usage or meaning of a word, the Court may utilize a dictionary. *St. Ignatius Nursing Home v. Department of Public Welfare,* 918 A.2d 838 (Pa.Cmwlth. 2007). When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit. Section 1921(b) of the Statutory Construction Act, 1 Pa.C.S. § 1921(b). Only when the words of a statute are ambiguous should a court seek to ascertain and effectuate the intention of the General Assembly through consideration of the various factors found in Section 1921(c). Section 1921 of the Statutory Construction Act, 1 Pa.C.S. § 1921; *Koken v. Reliance Ins. Co.,* 586 Pa. 269, 893 A.2d 70 (2006). A word is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. *Mishoe v. Erie Ins. Co.,* 573 Pa. 267, 824 A.2d 1153 (2003).

The CALJ determined that to "maintain" means to possess; since DPW never possessed the Provider Agreements, the documents cannot be construed as "public records" under the Law. Likewise, DPW and the Intervenors argue that the common and ordinary meaning of "maintain" is to hold, keep or possess. However, Petitioners contend that the word "maintain"

does not necessarily mean to have immediate, physical possession and can mean control. Petitioners assert that the word "maintain" is subject to multiple interpretations and is therefore ambiguous.

According to Black's Law Dictionary, the term "maintain" is "variously defined". Black's Law Dictionary 953 (6th ed. 1990). Definitions that would be logical in the context of the Law include: to hold; hold or keep in an existing state or condition; hold or preserve in any particular state or condition; keep in existence or continuance; keep in good order. *Id.* Webster's Dictionary provides similar definitions: to keep in an existing state (as of repair, efficiency, or validity). Webster's Ninth New Collegiate Dictionary 718 (1987). While the words keep, hold, sustain, uphold are used in these sources to define "maintain", the word "possession" is not included in either of the two definitions. Yet, the dictionary sources [6] cited by the parties include the word "possession" in the definition of "maintain": "to have or continue to have in your possession" and "to retain possession of." DPW's Brief at 15–16.

Given the parties' differing assertions concerning the meaning of the word, and our conclusion that both sides have provided reasonable interpretations, one simply cannot reasonably say that the word "maintain," as contained in the Law, is free from all ambiguity and subject to only one construction or understanding. Accordingly, we turn to factors set forth in Section 1921(c) of the Statutory Construction Act, 1 Pa.C.S. § 1921(c), to ascertain the intent of the legislature.

Pursuant to Section 1921(c) of the Statutory Construction Act, when the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters: (1) occasion and necessity for the statute; (2) circumstances under which it was enacted; (3) mischief to be remedied; (4) object to be attained; (5) former law, if any, including other statutes upon the same or similar subjects; (6) consequences of a particular interpretation; (7) contemporaneous legislative history; and (8) legislative and administrative interpretations of such statute. In evaluating all of these statutory factors, we conclude those most applicable to this appeal are the occasion and necessity for the statute, the mischief to be remedied, the consequences of a particular interpretation, former law and legislative history.

We begin with the occasion and necessity of the Law and the mischief the Law seeks to remedy. The Law is intended to assure the availability of government information to citizens of the Commonwealth by permitting access to official information. *Pennsylvania State University v. State Employees' Retirement Board,* 880 A.2d 757 (Pa.Cmwlth.2005), *aff'd* 594 Pa. 244, 935 A.2d 530 (2007); *Current Status, Inc. v. Hykel,* 778 A.2d 781 (Pa. Cmwlth.), *petition for allowance of appeal denied,* 567 Pa. 766, 790 A.2d 1019 (2001); *Arduino v. Borough of Dunmore,* 720 A.2d 827, 830 (Pa.Cmwlth.1998), *appeal dismissed,* 559 Pa. 415, 741 A.2d 195 (1999). The purpose of access is to keep open the doors of government, to prohibit secrets, to scrutinize the actions of public officials and to make public officials accountable in their use of public funds. *Newspaper Holdings, Inc. v. New Castle Area School District,* 911 A.2d 644 (Pa.Cmwlth.2006),

---

**6.** These sources include Webster's Revised Unabridged Dictionary (1913 ed.), the Cambridge Advanced Learner's Dictionary and the American Heritage Dictionary of the English Language (4th ed. 2000). Petitioners' Brief at 17; DPW's Brief at 15–16; Intervenor's Brief at 23–24.

*petition for allowance of appeal denied,* 592 Pa. 776, 926 A.2d 443 (2007); *Cogen, Sklar & Levick v. Commonwealth,* 814 A.2d 825 (Pa.Cmwlth.2003); *Envirotest Partners v. Department of Transportation,* 664 A.2d 208 (Pa.Cmwlth.1995). The definition of a "public record" must be liberally construed so as not to unduly restrict the public access to information granted by the Law. *Arduino.* If a document meets the general definition of a "public record", an agency must give access to the document, unless it falls within one of the enumerated exceptions set forth in Section 1 of the Law, 65 P.S. § 66.1. *Id.* The expenditure of public funds and the public's oversight of such conduct are of paramount importance. We, therefore, believe that a liberal construction of the word "maintain" is in keeping with the occasion and necessity of the Law and the mischief to be remedied.

We now consider the consequences of a particular interpretation. If this Court were to conclude that only documents within an agency's actual physical possession were subject to disclosure, we believe that public records could be shielded from disclosure by placing them in the hands of third parties. We do not believe the General Assembly intended to provide a loophole for agencies to conceal otherwise public records from public view. Despite our preference for a bright-line rule that actual possession would provide, such a result is not in the public's interest and is at odds with the purpose of the Law.

Alternatively, if this Court were to conclude that the word "maintain" is not limited to physical possession, but can encompass documents within an agency's control, more documents would be open to disclosure under the Law. However, disclosure would not be automatic. Rather, the right of access to public records is tempered by the definition of a "public record" con-

tained in the Law. A more expansive interpretation would simply lead to further examination of whether a document, which is not within an agency's physical possession, is otherwise *maintained* by the agency, qualifies as a "public record" under the Law and is not covered by one of the exceptions.

We next turn to former law and legislative history. Citing *Tribune–Review Publishing Co. v. Westmoreland County Housing Authority,* 574 Pa. 661, 833 A.2d 112 (2003) and *Carbondale Township v. Murray,* 64 Pa.Cmwlth. 465, 440 A.2d 1273 (1982), Petitioners maintain that actual possession of the public records by an agency is not required, provided that an agency has access to or can exert control over the public records; public records do not lose their public status merely because they are not in the possession of a particular agency at the time the request is made.

In *Tribune–Review,* a housing authority refused to provide a newspaper with access to a confidential settlement agreement between a former employee and the authority's liability insurer in a civil rights action. The authority argued that it did not authorize or sign the document at issue, nor did it ever see or possess the document, but that the attorney for its insurer possessed it. Our Supreme Court held that "lack of possession of an existing writing by the public entity at the time of a request pursuant to the [Law] is not, by itself, determinative of … whether the writing is a 'public record' subject to disclosure. *A writing is within the ambit of the [Law] if it is subject to the control of the agency.*" *Tribune-Review,* 574 Pa. at 671, 833 A.2d at 118 (emphasis added). If the preparation of a writing, such as a litigation settlement document, by an attorney for an agency or by an attorney-in-fact for the agency's insurer is not viewed as preparation by the agency, any public

entity could thwart disclosure required by the Law by having an attorney or an insurer's attorney prepare every writing that the public entity wishes to keep confidential. *Id.*

Similarly, in *Carbondale,* a newspaper reporter requested that the township make available to him the township's cancelled checks involving the road account and payroll account. The township asserted that it could not be compelled under the Law to provide access to its cancelled checks because they were retained by the bank and were not in the township's possession. The trial court ordered the township to authorize its bank to make copies of the checks available to the reporter on the basis that the cancelled checks, although in the possession of a second entity, were still subject to the township's control. On appeal, we affirmed. *Carbondale.* We stated that to conclude otherwise "would be permitting any governmental body to escape public scrutiny of its records by simply alleging that it no longer has possession of its public records." *Id.* at 1275.

The CALJ dismissed these cases because they were brought before the enactment of Act 100 and according to the CALJ, "their precedence is suspect." It is well settled that a legislative amendment of a statute supersedes any contrary case law. *See Buehl v. Horn,* 728 A.2d 973 (Pa.Cmwlth.1999). However, the cases cited by Petitioners are not contrary to Act 100. While Act 100 added the definition for "record," it did not alter the definition of a "public record." Additionally, Act 100 repealed Section 3 of the Law, 65 P.S. § 66.3, which provided that citizens "shall have the right to take extracts or make copies of public records and to make photographs or photostats of the same *while such records are in the possession, custody and control of the lawful custodian* or his authorized deputy." (Emphasis added). While DPW argues that removal of the word "control" from the Law is a clear and unambiguous expression of legislative intent, we observe that the words "possession" and "custody" were likewise removed.

Review of the legislative history reveals that the General Assembly had no intention of changing the definition of a "public record" with the amendments created by Act 100. Statements made by legislators during the enactment process, although not dispositive of legislative intent, may be properly considered as part of the contemporaneous legislative history. *Commonwealth v. Wilson,* 529 Pa. 268, 275 n. 4, 602 A.2d 1290, 1294 n. 4 (1992), *cert. denied, Aultman v. Pennsylvania,* 504 U.S. 977, 112 S.Ct. 2952, 119 L.Ed.2d 574 (1992). During the floor debate on consideration of Act 100, the principal sponsor, Representative John Maher, was specifically questioned about the new definition of "record" contained in the bill. Representative Maher responded:

The definition of "record" is essentially unchanged. The goal of this bill is not to redefine what is a public record ...; the goal of this bill is to deal with the vast majority of concerns that you and I and others have likely heard from constituents when there is something which is clearly a public record that they have been denied access to. This really gets at accessing public records, not trying to redefine them. That work we must take up another day.

\* \* \*

[Y]ou point to one of the reasons that there is a very desirable effort ahead of us to redefine what is a public record, because the answers to these sorts of questions ought to be crystal clear in statute, not depending upon 45 years' worth of case law, and because it does depend on 45 years' worth of case law, I

cannot give you simple answers. We need to head ultimately towards a standard where we can have those simple answers, but today's bill is really dealing with access to those things which are public records....

House Legislative Journal, March 25, 2002 at 441.

In light of this history, we believe that the General Assembly did not intend to supersede any existing case law on what constitutes a "public record" and that the cases cited above remain good law. Additionally, we note that *Tribune–Review* and *Carbondale* have been cited in post Act 100 cases. *Palmer v. Pennsylvania State Police*, 928 A.2d 1165 (Pa.Cmwlth.2007); [7] *see Pennsylvania State University v. State Employees' Retirement Board*, 594 Pa. 244, 935 A.2d 530 (2007); *Newspaper Holdings; Parsons v. Urban Redevelopment Authority*, 893 A.2d 164 (Pa.Cmwlth. 2006), *petition for allowance of appeal denied*, 591 Pa. 668, 916 A.2d 635 (2007).

It is the axiom of statutory construction that whenever possible each word in a statutory provision is to be given meaning and not treated as surplusage. Section 1921(a) of the Statutory Construction Act, 1 Pa.C.S. § 1921(a). Act 100's inclusion of the definition of "record" is by no means superfluous. The thrust of Act 100 is on access and the procedure by which records

can be obtained. *See* Sections 2 and 3.3 of the Law, 65 P.S. § 66.2, § 66.3–3; House Legislative Journal, March 25, 2002 at 440. Act 100 requires agencies to respond to requests for public records within 10 days. Sections 3.3 and 3.4 of the Law, 65 P.S. §§ 66.3–3 and § 66.3–4. Due to the new time constraints, it is logical to require that the records requested must be "maintained" by an agency, otherwise compliance would not be possible. This is consistent with Section 2(e) of the Law, 65 P.S. § 66.2(e), which provides that "an agency shall not be required to create a public record that does not currently exist or compile, maintain, format or organize a public record in a manner in which the agency does not currently compile, maintain, format or organize the public record." *See Palmer; Rowland v. Public School Employees' Retirement System*, 885 A.2d 621 (Pa.Cmwlth.2005), *petition for allowance of appeal denied*, 587 Pa. 703, 897 A.2d 462 (2006).

■ After considering the various factors in order to discern the legislature's intent, we conclude that the General Assembly intended the term "maintain" to include records that are within an agency's possession, custody, *or* control. We find this construction embraces the goals of the Law and best upholds the interests of the general public by permitting disclosure of

---

7. In *Palmer*, an inmate requested for a copy of a criminal laboratory user fee statement from the Pennsylvania State Police (PSP). Relying upon *Tribune-Review* and *Carbondale*, the inmate argued that the PSP had constructive possession or control over the user fee statement in that it may authorize those in possession to produce it. We distinguished this case from the cases cited because there was no evidence that the PSP was attempting to escape public scrutiny of the requested record. *Palmer*. In fact, in an attempt to locate the requested document, the PSP requested that other agencies search for the user fee statement or the laboratory report

number to no avail. *Id.* Also, the user fee statement requested by the inmate was not known to be in the possession of any agency. *Id.* Therefore, it was not within the PSP's control. *Id.* The inmate cited no law that requires an agency to provide a public record that neither it nor any other agency possesses or can determine if it possesses. *Id.* Indeed, the Law does not require an agency to create a public record that does not currently exist. *Id.*; Section 2(e) of the Law, 65 P.S. § 66.2(e). Thus, we affirmed the PSP's order denying the inmate's right-to-know request. *Palmer*.

public records. Additionally, we find our conclusion regarding legislative intent is consistent with the New Right–to–Know Law.[8] Thus, the proper analysis under the Law is not whether an agency has actual, physical possession of a document at a particular moment in time, but rather whether the agency has access and can exert control over such records.

Here, the HealthChoices Agreement between DPW and the Health Plan requires the Health Plan to establish and maintain a provider network and enter Provider Agreements with hospital providers. DPW dictates terms that must be included in the Provider Agreements in order to comply with federal and state law. To ensure this compliance, DPW has a contractual right to order the Health Plan to make all Provider Agreements available to DPW "within five (5) days of a request." R.R. at 541a. The contract also imposes a records retention policy on the Health Plan. R.R. at 541a–542a; 626a–628a.

While DPW does not, at the present time, physically possess copies of the Provider Agreements, DPW has undeniable access to and can exert control over the Provider Agreements. DPW does not have the right to evade disclosure of public documents by keeping these records with the Health Plan. We, therefore, conclude that the Provider Agreements are "maintained" by DPW and are "records" for purposes of the Law. To conclude otherwise would promote the very mischief the Law seeks to remedy by permitting agencies to place records in the hands of third parties to circumvent disclosure.

### 3. PUBLIC RECORD

Having determined that the Provider Agreements constitute "records" under the Law, we turn our inquiry to whether the Provider Agreements are "public records." Under Section 1 of the Law, a "public record" is defined as "any account, voucher or contract dealing with the *receipt or disbursement of funds by an agency* ... and any minute, order or decision by an agency fixing the personal or property rights, privileges, immunities, duties or obligations of any person or group of persons." 65 P.S. § 66.1 (emphasis added). Basically, "public records" fall into two categories: (1) accounts, vouchers, or contracts dealing with fiscal aspects of government, and (2) minutes, orders or decisions fixing personal or property rights of a person. *North Hills News Record v. Town of McCandless*, 555 Pa. 51, 722 A.2d 1037 (1999). Our Supreme Court has concluded that the first category, i.e., documents dealing with the receipt or disbursement of funds, should be interpreted expansively, whereas the second category, documents "fixing" the rights of persons, is to be afforded a "somewhat narrower construct." *Id.* at 55, 722 A.2d at 1039. As our Supreme Court has observed, the "liberal definition" of a "public record" in Section 1 of the Law applies to a wide range of documents that contain information relating to the receipt or disbursement of public funds. *Tribune–Review*, 574 Pa. at 668, 833 A.2d at 116. This "category of documents should be broadly construed and need only constitute records evidencing disbursement of government money." *North Hills News*, 555 Pa. at 55, 722 A.2d at 1039.

---

**8.** The new law includes the phrase "agency possession," which is defined as "a public record that is not in the possession of an agency but is in the possession of a party with whom the agency has contracted to perform a governmental function on behalf of the agency, and which directly relates to the governmental function." Section 506 of the New Right-to Know Law, 65 P.S. § 67.506.

Here, the CALJ determined that the Provider Agreements are not "public records" because the Health Plan is not an *agency* and was not acting as an *agent of DPW* by paying its hospital providers for services rendered to Medicaid recipients. However, Petitioners contend that a private entity does not have to have a formal agency relationship in order for documents in the private entity's possession to be deemed public records under the Law.

In order to establish the existence of an agency relationship, a party must show that: (1) there was a manifestation by the principal that the agent would act for it; (2) the agent accepted such an undertaking; and (3) the principal retained control of the endeavor. *Tribune–Review,* 574 Pa. at 674, 833 A.2d at 119–20. "[A]gency results only if there is an agreement for the creation of a fiduciary relationship with control by the beneficiary." *Smalich v. Westfall,* 440 Pa. 409, 413, 269 A.2d 476, 480 (1970). The burden of establishing an agency relationship rests with the party asserting the relationship. *Basile v. H & R Block, Inc.,* 563 Pa. 359, 761 A.2d 1115 (2000). "An agency relationship is a fiduciary one, and the agent is subject to a duty of loyalty to act only for the principal's benefit." *Sutliff v. Sutliff,* 515 Pa. 393, 404, 528 A.2d 1318, 1323 (1987) (citing Restatement (Second) of Agency § 387 (1958)).

In *Associated Builders & Contractors, Inc. v. Pennsylvania Department of General Services,* 747 A.2d 962 (Pa.Cmwlth. 2000), a party requested a copy of an agreement between a construction manager, which was retained by the Department of General Services (DGS) to oversee a building project, and the successful bidder for a construction management insurance program. DGS denied the request on the basis that DGS was not a party to the agreement between the construction manager and the insurance broker. *Associated Builders.* On appeal, this Court observed that if DGS had contracted directly with the insurance broker there would be no question that the contract is a public document. *Id.* at 967. Further, the Law does not permit an agency to avoid its obligation to disclose documents by contracting indirectly through a third party. *Id.* Thus, we held that the agreement was a public record subject to disclosure under the Law and we reversed DGS's decision to deny disclosure. *Id.*[9]

In *Dynamic Student Services v. State System of Higher Education,* 548 Pa. 347, 697 A.2d 239 (1997), Dynamic Student Services (DSS), a dealer in used textbooks, requested Millersville University to supply registration and approved course material information so that it might anticipate future student needs. Millersville supplied the registration data to DSS, but refused to provide information on course materials because the school did not compile such information. DSS filed suit to obtain the information pursuant to the Law. The Supreme Court concluded that, although state universities were state agencies subject to the Law's disclosure requirements, the university was not required, under the Law, to produce information concerning required textbooks and course materials. *Dynamic Student Services.* The Court found that the university had no part in the ordering or selling of textbooks and neither solicited, compiled, nor retained information on course materials. *Id.* Ultimately, the Court concluded that despite the fact that the non-profit organization that operated the university bookstore was

9. While DPW argues that this case was superseded by Act 100, as discussed above in connection with *Tribune–Review* and *Carbondale,* we believe this case is remains viable precedent.

required to work closely with university in order to carry out its stated purposes, it did not lose its status as an independent entity for purposes of the disclosure requirements of the Law. *Id.*

In *Tribune–Review*, the Supreme Court distinguished *Dynamic Student Services*, explaining that the records of an independent entity do not become public records solely because of the entity's relationship with public agencies. Rather, "[a] greater involvement is required, such as the expenditure of funds or the underwriting of liability...." *Tribune–Review*, 574 Pa. at 678, 833 A.2d at 122. Therein, the housing authority contracted with an insurer to defend it in the event of suit. *Tribune–Review*. The insurer accepted the undertaking when it executed the contract for legal services with the housing authority. *Id.* Even though the housing authority did not agree with the insurer that the suit should be settled, the Supreme Court determined that the insurer "stood in the shoes of the housing authority in prosecuting the suit and functioned as its agent." *Id.* at 675, 833 A.2d at 120. An agent "holds the power to alter the legal relations between the principal and third persons...." *Id.* (citing Restatement (Second) of Agency § 12). The Court determined that the relationship in *Tribune–Review* was an entirely different relationship from that of the state universities and their independently-owned bookstores in *Dynamic Student Services*. *Id.*

We believe the instant matter is more akin to *Associated Builders* and *Tribune–Review* than *Dynamic Student Services*. Applying agency principals to the instant matter, we believe the Provider Agreements at issue are the product of the agency relationship between DPW and the Health Plan. The HealthChoices Agreement constitutes a manifestation by DPW that the Health Plan shall administer the HealthChoices Program and the acceptance of the undertaking by the Health Plan. Since Pennsylvania's Medical Assistance program must meet all requirements of the federal and state law [10] in order to acquire funding, DPW established strict controls in the HealthChoices Agreement.

Pursuant to the HealthChoices Agreement, the Health Plan must, among other things, form a provider network, execute written Provider Agreements according to

---

10. A State's participation in a medical assistance program is voluntary but, to receive federal money to fund the program, its approved plan must meet all requirements of the federal statute and implementing regulations. *Millcreek Manor v. Department of Public Welfare*, 796 A.2d 1020, 1025 (Pa.Cmwlth. 2002). Although States have a certain amount of discretion in formulating the terms of their medical assistance programs, this discretion is not unlimited, because the State must fully comply with the federal statutes and regulations governing the medical assistance program. *Id.* Federal law requires that States applying for medical assistance must comply with the provisions of Section 1902 of the Social Security Act (Act), 42 U.S.C. § 1396a. A State plan must "provide such safeguards as may be necessary to assure that eligibility for care and services under the plan will be ... provided, in a manner consistent

with simplicity of administration and the best interests of the recipients." Section 1902(a)(19) of the Act, 42 U.S.C. § 1396a(a)(19). Among other things, the State medical assistance program must also "provide such methods ... relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care...." Section 1902(a)(30)(A) of the Act, 42 U.S.C. § 1396a(a)(30). Federal regulations set forth standards for denial, termination, and nonrenewal of Medicaid provider agreements. "If the Medicaid agency has adequate documentation showing good cause, it may refuse to execute an agreement, or may cancel an agreement, with a certified facility." 42 C.F.R. § 442.12(d).

terms dictated by DPW and comply with the terms and conditions set forth in the HealthChoices Agreement, including the operational and financial standards. The Health Plan must also provide DPW with unfettered access to records of the Health Plan to ensure compliance with the requirements under the Agreement and under the Law. DPW agrees to make payments to the Health Plan using per member month rates and the Health Plan administers Medicaid benefits by paying its hospital providers for services rendered to Medicaid recipients. Through Provider Agreements, the Health Plan agrees to pay hospital providers negotiated rates for medical services rendered to Medicaid enrollees.

In doing this, the Health Plan is fulfilling DPW's duties to administer the Medical Assistance program. Had DPW contracted directly with the hospitals to provide medical services, there would be no doubt that the Provider Agreements are public records subject to disclosure. While the HealthChoices Agreement between DPW and the Health Plan expressly states that the Health Plan is not to hold itself out as an agent or representative of DPW and that the relationship between the parties is that of independent contracting parties (R.R. at 488a), the fact remains that the Health Plan is performing a duty that would ordinarily be handled by DPW. In essence, the Health Plan stands in the shoes of DPW in administering the HealthChoices Program. We, therefore, conclude that the Provider Agreements are the product of the agency relationship that exists between DPW and the Health Plan.

### 4. PUBLIC FUNDS

■ Petitioners contend that the Provider Agreements deal with the disbursement of public funds and that the CALJ erred in determining that DPW transformed public funds into private funds by transmitting them the Health Plan for disbursement. We agree.

In *Morning Call, Inc. v. Lower Saucon Township*, 156 Pa.Cmwlth. 397, 627 A.2d 297 (1993), a newspaper requested to examine and inspect a settlement agreement between the township and private party. The agreement settled a federal civil rights action, which was based upon the alleged conduct of the township's police officers. The terms of the settlement agreement provided for the township to pay the deductible to its insurance carrier which in turn compensated the plaintiff. The township refused the newspaper's request, asserting that the agreement was not a "public record." On appeal, we determined that the settlement agreement was a "public record" for the purposes of the Law. We explained:

Here, the Township signed the Settlement Agreement, making it obligated to pay the entire settlement if its insurance carrier failed to do so. For that reason alone, the document is a public record. Not only did the Settlement Agreement make the Township obligated to satisfy [the plaintiff's] claim if the insurance carrier did not, the Settlement Agreement obligated it to make an appropriation of public money. It required the Township to pay [the plaintiff] the Five Thousand Dollars ($5,000) that the insurance company was not obligated to pay under the terms of the insurance policy. *Paying the money to the insurance carrier and not directly to [the plaintiff] does not change the fact that it was used to satisfy the Township obligation, and, 'laundering' it through the insurance carrier does not somehow change the character of those funds from public to private.* Because it obligates the Township to disburse public funds to satisfy an obli-

gation, the Settlement Agreement is a public record and subject to public inspection and copying.

*Morning Call,* 627 A.2d at 300–01 (emphasis added).

Likewise in *Associated Builders,* 747 A.2d at 965, we opined, "an agency may not shield a public document from disclosure by contracting with a third party that subsequently [disburses] the government funds. By paying through a third party, an agency does not change the character of those funds from public to private." In *Sapp Roofing,* a plurality of the Supreme Court held that a private roofing contractor's payroll records, which had been submitted to the government in connection with the performance of a public project, were public records under the Law. The Court reasoned that these documents qualified as public records "because they are records evidencing a disbursement by the school district." *Sapp Roofing,* 552 Pa. at 110, 713 A.2d at 629.

There is no question that the Medicaid funds for the HealthChoices Program derive from federal and state funds. DPW argues, however, that once the public money is received by the Health Plan, a private entity, the money belongs to the Health Plan and is private. Had the purpose of the money been simply to provide funding to private MCOs or HMOs, such as the Health Plan, we would agree that the money became private once in the hands of those entities and how the money was spent would not be subject to disclosure. However, that is not the case here. The purpose of the public money disbursed by DPW is to provide medically necessary services to Medicaid recipients. The Health Plan does not administer these services, but instead acts as an intermediary by contracting with provider hospitals to provide such services. Until the public funding reaches the intended Medicaid recipient, the money remains public.

The Intervenors argue that the commingling of funds in the account make it impossible to ascertain what particular funds are used to pay for various expenses of the Health Plan. The commingling of public funds received from DPW with the Health Plan's private funds does not alter the nature of the public funds. The Provider Agreements illustrate how public money, which is intended for Medicaid beneficiaries, is being expended in the furtherance of that goal.

DPW must ensure that public funds are properly expended and in accordance with federal and state law as well as with the terms of the HealthChoices Agreement between the Health Plan and DPW. Therefore, DPW maintains control and access to the Provider Agreements to ensure that the public funds are going toward their intended public purpose. Without such a safeguard in place, it would be impossible to determine whether the public funds were used for their intended purpose and it is conceivable that such funds could be misappropriated. As discussed above, accountability in the disbursement of public funds is a primary purpose of the Law.

The Provider Agreements reflect the expenditure of public funds for the benefit of Medicaid beneficiaries. DPW cannot circumvent the disclosure of this money trail by contracting indirectly through the Health Plan and other MCOs or HMOs. Private entities that receive or control public funds have a duty to account for their handling of those funds. Disclosure of the Provider Agreements is the only way to ensure such accountability. To shield such documents from review would circumvent the public's ability to determine how tax dollars are spent. Thus, since the Provider Agreements reflect the disbursement of public funds in a public

program, we conclude that those contracts are public records under the Law.

### 5. *TRADE SECRETS*

■ Lastly, Petitioners contend that the CALJ erred in determining that the Provider Agreements contained information protected under the Trade Secrets Act. We agree.

The definition of "public record" states that the term "shall not include any ... document ... access to or the publication of which is prohibited, restricted or forbidden by statute law...." 65 P.S. § 66.1. Pursuant to Section 5302 of the Trade Secrets Act, 12 Pa.C.S. § 5302, a "trade secret" is defined as:

Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

■ Factors relevant to determining whether information is a trade secret are the extent to which it is known outside the owner's business; extent to which it is known by employees and others within the owner's business; extent of measures taken to guard the secrecy; value of information to competitors; effort or money expended to develop the information; and ease or difficulty with which it could be properly acquired or duplicated. *Iron Age Corp. v. Dvorak,* 880 A.2d 657 (Pa.Super.2005). It must be an actual secret of peculiar importance to the business and constitute competitive value to the owner. *Id.*

In *Parsons v. Pennsylvania Higher Education Assistance Agency,* 910 A.2d 177 (Pa.Cmwlth.2006), *petition for allowance of appeal denied,* 591 Pa. 686, 917 A.2d 316 (2007), this Court addressed the Trade Secrets Act as an exception to the Law. Therein, the newspaper requested the vouchers for expenses for travel and for the retreats conducted by PHEAA, which PHEAA denied. On appeal, PHEAA argued the documents were trade secrets and, therefore exempt from disclosure, but acknowledged that many of the vouchers and receipts would contain no competitive information at all. We determined that the requested documents were public records under the Law. *Parsons.* We opined that to constitute a "trade secret" under state Trade Secrets Act, it must be an "actual secret of peculiar importance to the business and constitute competitive value to the owner." *Id.* at 185. We rejected PHEAA's contention that the Trade Secrets Act may serve as an exception to the Law to exempt public records containing no trade secrets at all. *Id.* The Law favors public access regarding any expenditure of public funds. *Id.* We were cognizant of the fact that some of the requested records may refer to secret information of competitive value and determined that the information may be redacted and the balance supplied under Law. *Id.* We retained jurisdiction over this matter should any disputes arise over the extent of any redaction. *Id.*

Here, there is no basis upon which to conclude that the Provider Agreements, which the Health Plan entered into with provider hospitals at the direction of DPW for the disbursement of public funds, are trade secrets. While the Intervenors presented evidence that the Provider Agreements contain confidentiality provisions and are not known outside of the Health

Plan and UPMC, a party that voluntarily participates in a public program and is receiving and disbursing public funds in furtherance of that program has no legitimate basis to assert that these activities are private and should be shielded from public scrutiny. The threat of competition from WPAHS is insufficient to invoke an exemption under the Law from disclosure. We, therefore, conclude that the CALJ erred in determining that the Provider Agreements were exempt from disclosure.

Accordingly, the order of the CALJ is reversed.

## *O R D E R*

AND NOW, this 3rd day of June, 2009, the order of the Chief Administrative Law Judge of the Department of Public Welfare, Bureau of Hearing and Appeals, dated December 6, 2007, is REVERSED. The Department of Public Welfare is ordered to provide Petitioners access to items described in their written right-to-know request within ten (10) business days of this order.