HOMETOWN PROPERTIES, INC., et al.

v.

Nancy Hsu FLEMING.

No. 94–606–M.P.

Supreme Court of Rhode Island.

June 25, 1996.

**58**

Anthony F. Muri, Barbara S. Cohen, Providence, for Plaintiff.

Amelia E. Edwards, Providence, Michael L. Rubin, Asst. Attorney General, for Defendant.

## OPINION

LEDERBERG, Justice.

In this case we construe for the first time the provisions of G.L.1956 chapter 33 of title 9, as enacted by P.L.1993, chs. 354, 448, an act entitled "Limits on Strategic Litigation Against Public Participation" (the anti-SLAPP statute or the act). The plaintiffs, Hometown Properties, Inc., Homevest, Inc., Charles H. Gifford, III, Michael L. Baker, and Edward B. Mancini (collectively referred to as "Hometown" or "plaintiffs") brought suit against Nancy Hsu Fleming (Fleming or defendant), claiming that Fleming's communications with various state and federal governmental officials constituted both tortious interference with contractual relations and defamation. Invoking the provisions of the act, Fleming moved to dismiss Hometown's action as "strategic litigation against public participation" or a SLAPP suit and argued that the suit attempted to abridge her rights to free speech and to petition government for the redress of grievances. Fleming sought this Court's review of the Superior Court's denial of her motion to dismiss Hometown's suit. For the reasons stated below, we grant certiorari, quash the decision of the motion justice, and remand this case to the Superior Court with directions to enter summary judgment for the defendant.

### Facts and Procedural History

The plaintiffs are the owners of a landfill in North Kingstown, Rhode Island. On or about November 21, 1991, and February 17, 1992, a number of North Kingstown residents, Fleming among them, participated in meetings with Louise Durfee (Durfee), then director of the Rhode Island Department of Environmental Management (DEM). The meetings focused on two issues: alleged ground-water contamination caused by landfills, specifically plaintiffs' landfill, and DEM's proposed rules and regulations concerning landfills. Following these meetings, Fleming wrote a letter to Durfee and posted copies to various state and federal officials. The letter, dated April 12, 1992, stated, *inter alia:*

> "We take this opportunity to express our appreciation for your continued consideration of our efforts to close and clean up the Hometown/Homevest landfill.
>
> " * * *
>
> "In letters to you and in meetings with you, we have developed the following understandings:
>
> " * * *
>
> "5. There are clear statements by the EPA and other experts that the Landfill contains hazardous waste, that the Landfill continues to contaminate offsite groundwater exceeding Maximum Contamination Levels, that the Landfill should be closed and cleaned-up, and that onsite monitoring wells were never purposely placed to detect concentrations of leachate.
>
> "6. The Landfill is on track to being declared a Superfund site.
>
> "7. The Town expert has documented a three-year history of groundwater contamination, levels of contamination that would have never been detected were the Town to have relied on the onsite wells for the protection of its Citizen's drinking water.
>
> " * * *
>
> "9. The Owners of the Landfill have consistently refused to contribute to the Town's effort to monitor the groundwater, and has [*sic* ], as a matter of fact, vigorously resisted monitoring activities by your own office."

The letter went on to comment on the proposed new "Rules and Regulations For Groundwater Quality." In response, Home-

town, through its counsel, informed Fleming by letter that if she did not "(a) provide to us the specific facts and documents on which your statements were based or (b) confirm to us in writing that you will promptly furnish to Louise Durfee, and the other officials to whom your April 12 letter was copied, the retraction which is enclosed," then Hometown would "have no alternative but to pursue the formal legal remedies available."

Fleming did not retract her statements, and on December 2, 1992, Hometown filed a complaint in the Superior Court, alleging defamation and tortious interference with contractual relations and seeking compensatory and punitive damages. Fleming filed a motion to dismiss Hometown's action pursuant to Rule 12(b)(6) of the Superior Court Rules of Civil Procedure and claimed an absolute constitutional privilege against tort liability arising from her statements in the April 12, 1992 letter to Durfee. The Attorney General filed a motion seeking leave to appear as *amicus curiae* in Fleming's behalf. On April 19, 1993, a justice of the Superior Court denied Fleming's motion to dismiss and granted the motion of the Attorney General only to the extent of permitting him to file a brief in support of Fleming.

Subsequent to the Superior Court's denial of Fleming's first motion to dismiss, the General Assembly, on July 24, 1993, enacted the anti-SLAPP statute, P.L.1993, ch. 448, § 1. The act applied retroactively to all actions that had "not been fully adjudicated on, or subsequent to, the effective date" of the act, and allowed a party to such an action to file a "special motion to dismiss a claim" within sixty days of the effective date of the act. Public Laws 1993, ch. 448, § 2.

On September 17, 1993, relying on the anti-SLAPP statute, Fleming filed a second motion to dismiss and a motion to stay discovery. Hometown objected to Fleming's motions, arguing that the anti-SLAPP statute was unconstitutional and, in the alternative, that Fleming had failed to demonstrate that the anti-SLAPP statute would protect her from liability. Fleming's second motion to dismiss was not decided, but was passed on by the motion justice. On February 24, 1994, the Attorney General filed a notice of intervention pursuant to Rule 24(d) of the Superior Court Rules of Civil Procedure and G.L.1956 §§ 9–30–11 and 9–33–3.

Fleming filed a third motion to dismiss on May 25, 1994. Accompanying her memorandum in support of the motion, Fleming submitted various scientific reports and government documents attached to her affidavit that avowed that the disputed statements were made in response to a request for public comment on the proposed DEM landfill rules and regulations. She further averred that her statements were supported by and derived from the documents attached to her affidavit.

After oral argument on the third motion, the motion justice, on August 4, 1994, denied Fleming's motion. In her decision, the motion justice declined to address the constitutionality of the act. Instead, she presumed that the anti-SLAPP statute was constitutional but determined that she could not rule as a matter of law that Fleming was entitled to immunity under its provisions. The motion justice stated that she was "not satisfied that defendant has demonstrated that she falls within the class of defendants defined" in the anti-SLAPP statute. In addition, the motion justice rejected Fleming's argument that she was entitled to protection under the so-called *"Noerr–Pennington"* doctrine developed by the United States Supreme Court. Because Hometown's complaint included "allegations of the tort of libel," the motion justice determined that *Noerr–Pennington* was inapplicable, and she relied, instead, on the Supreme Court's rulings in *McDonald v. Smith*, 472 U.S. 479, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985) (holding that the petition clause does not provide absolute immunity to defendants charged with libel), and *White v. Nicholls*, 44 U.S. (3 How.) 301, 11 L.Ed. 591 (1845) (defining malice as "falsehood and the absence of probable cause").

Fleming petitioned this Court for issuance of a writ of certiorari on October 17, 1994, and the petition was granted on May 11, 1995. Fleming contended on review that the motion justice erred by failing to apply the *Noerr–Pennington* doctrine in interpreting the anti-SLAPP statute and by failing to treat Fleming's special motion to dismiss as a

motion for summary judgment. Hometown, on the other hand, argued that the motion justice committed no errors of law in her interpretation of the relevant authority and further argued that the act is unconstitutional.

### Constitutionality of the Anti– SLAPP Statute

■■■ As a preliminary matter, we reject Hometown's allegations that the anti-SLAPP statute is unconstitutional. Hometown recited seven separate challenges to the statute on the following state and federal constitutional grounds: equal protection, right to a trial by jury, due process, retroactive application, separation of powers, denial of access to state courts, and bill of attainder. In addressing these challenges, we find it sufficient to recognize that "if a serious doubt of constitutionality is raised, it is a cardinal principle that [a] Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598, 619 (1932). In keeping with this long-recognized principle of constitutional scrutiny, we shall, in construing statutory language, adopt that interpretation that allows us to avoid a finding of unconstitutionality. *Advisory Opinion to the Governor (DEPCO),* 593 A.2d 943, 946 (R.I. 1991). We are of the opinion that such a construction not only is possible but is also warranted in this instance.

### *Noerr-Pennington* Doctrine and the "Sham" Exception

■■ The United States Supreme Court developed the *Noerr–Pennington* doctrine in the context of antitrust litigation in order to protect the legitimate exercise of the constitutional right to petition the government after retributive civil claims were brought by parties harmed by petitioning activity. *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 56, 113 S.Ct. 1920, 1926, 123 L.Ed.2d 611, 621 (1993) (citing *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961)).

This Court has adopted the *Noerr–Pennington* premise and has applied its protection to common-law tort claims. In *Cove Road Development v. Western Cranston Industrial Park Associates,* 674 A.2d 1234, 1236 (R.I.1996), Cove Road, a developer, brought suit against the defendant landowners (Western Cranston), alleging that Western Cranston had engaged in malicious prosecution and abuse of process by instituting and pursuing an appeal of zoning amendments sought by Cove Road and granted by the city of Cranston. We held that Cove Road's claims "must be examined under the rubric of *Noerr–Pennington* immunity inasmuch as the provisions of the United States and Rhode Island constitutions take precedence over common-law tort doctrines, U.S. Const. Art. VI; R.I. Const. art. 15, sec. 1, *as do the statutory requirements of § 9–33–2* [the anti-SLAPP statute]." 674 A.2d at 1239. (Emphasis added.) This Court concluded that Western Cranston's opposition to Cove Road's efforts to obtain zoning relief could not serve as the basis for Cove Road's tort claims. *Id.; see also Pound Hill Corp., Inc. v. Perl,* 668 A.2d 1260, 1263 (R.I.1996) ("[a]lthough the [*Noerr–Pennington* ] doctrine arose in a context of application of the antitrust statutes, it is based upon the First Amendment right to petition the government for redress of grievances").

■■■ We have also adopted the Supreme Court's position that petitioning activity that amounts to "a mere sham" is not immune under *Noerr–Pennington. Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 144, 81 S.Ct. 523, 533, 5 L.Ed.2d 464, 475 (1961). Consequently, sham petitioning activities that "are not genuinely aimed at procuring favorable government action" but constitute inappropriate uses of governmental *process,* are not protected under the doctrine. *Pound Hill,* 668 A.2d at 1263. We assess whether the petitioning activity constitutes a sham under *Noerr–Pennington* by determining whether the activity is "objectively baseless in the sense that no reasonable [petitioning activist] could realistically expect success on the merits." *Cove Road,* 674 A.2d at 1238 (quoting *Professional Real Estate Investors, Inc.,* 508

U.S. at 60, 113 S.Ct. at 1928, 123 L.Ed.2d at 624). If and only if we find the petitioning activity to be objectively baseless, shall we then examine the subjective motivation behind the activity. *Id.*

### Petitioning Activity Protected under the Anti–SLAPP Statute

The General Assembly enacted the anti-SLAPP statute in 1993. P.L.1993, chs. 354, 448. Like the *Noerr–Pennington* doctrine, the anti-SLAPP statute was adopted in order to protect valid petitioning activities. This purpose is evinced by § 9–33–1 of the act, which states:

"The legislature finds and declares that full participation by persons and organizations and robust discussion of issues of public concern before the legislative, judicial, and administrative bodies and in other public fora are essential to the democratic process, that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances; that such litigation is disfavored and should be resolved quickly with minimum cost to citizens who have participated in matters of public concern." P.L.1993, ch. 448, § 1.

As enacted in 1993, § 9–33–2(a) of the anti-SLAPP statute provided:

"In any case in which a party asserts that the civil claims * * * against said party are based on said party's lawful exercise of its right of petition or of free speech * * * in connection with a matter of public concern, said party may bring a special motion to dismiss. * * * The court shall grant such special motion if the moving party by the preponderance of the evidence shall demonstrate to the satisfaction of the court (a) that the claim * * * subject to the motion is an action involving petition or free speech * * * and (b) that said moving party did not engage in a course of tortious conduct toward the party against whom such special motion is made. In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based."

According to § 9–33–2(e) of the act,

" 'a party's exercise of its right of petition or of free speech' shall mean any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; or any written or oral statement made in connection with an issue of public concern."

In 1995 the General Assembly amended § 9–33–2 (P.L.1995, ch. 386, § 1). As amended, the provisions of § 9–33–2 are nearly identical to the Supreme Court's articulation of the constitutionally derived conditional immunity afforded to nonsham petitioning activity under *Noerr–Pennington.* Specifically, § 9–33–2(a) now provides:

"**Conditional immunity.**—(a) A party's exercise of his or her right of petition or of free speech under the United States or Rhode Island Constitutions in connection with a matter of public concern shall be conditionally immune from civil claims, counterclaims, or cross-claims. Such immunity will apply as a bar to any civil claim, counterclaim, or cross-claim directed at petition or free speech * * * except if said petition or free speech constitutes a sham. Petition or free speech constitutes a sham only if it is not genuinely aimed at procuring favorable government action, result or outcome, regardless of ultimate motive or purpose. Petition or free speech will be deemed to constitute a sham as defined in the previous sentence only if it is both:

(1) objectively baseless in the sense that no reasonable person exercising the right of speech or petition could realistically expect success in procuring such government action, result, or outcome, and

(2) subjectively baseless in the sense that it is actually an attempt to use the governmental process itself for its own direct effects. Use of outcome or result of the governmental process shall not consti-

tute use of the governmental process itself for its own direct effects."

Section 9–33–2(e) was not amended in 1995. Because the 1995 amendments relating to SLAPP suits were not applied retroactively to actions pending at the time of passage, our review of the motion justice's determinations must turn on the original 1993 enactment. In its written and oral arguments before this Court, Hometown argued that the original act contained "no language remotely resembling the 'outcome/process' test" of the *Noerr–Pennington* sham exception, and that "[t]he recent amendments to the Statute confirm that, as originally enacted, it did not include the 'outcome/process' test." Therefore, the gravamen of Hometown's argument was that the General Assembly's action in amending the act "demonstrates a legislative intent to establish a standard different from that previously prescribed." Accordingly, Hometown contended that the motion justice did not err in refusing to apply the outcome-process, sham test under *Noerr–Pennington*. With this contention, we must disagree.

■ Although it is generally true that, when a statutory provision is amended, the General Assembly is assumed to have intended to accomplish some purpose thereby, such purpose may be the clarification—rather than the alteration—of the original enactment. *Gonsalves v. City of West Haven*, 232 Conn. 17, 24, 653 A.2d 156, 159–60 (1995). In particular, the amendment of an ambiguous statutory declaration may be viewed as an attempt to resolve the ambiguity. 1A *Sutherland Statutory Construction* § 22.30 at 266–68 (5th ed.1992); *see also Grunebaum v. Commissioner of Internal Revenue*, 420 F.2d 332, 336 (2d Cir.), *cert. denied*, 397 U.S. 1075, 90 S.Ct. 1523, 25 L.Ed.2d 810 (1970); *Snyder v. New Hampshire Savings Bank*, 134 N.H. 32, 36, 592 A.2d 506, 508 (1991). When a subsequent amendment serves to clarify, rather than to change, the amended statute, the amendment is entitled to great weight in construing the preamendment version of the law. See, *e.g., United States v. Monroe*, 943 F.2d 1007, 1016 (9th Cir.), *cert. denied*, 503 U.S. 971, 112 S.Ct. 1585, 118 L.Ed.2d 304 (1992); *Boddie v. American Broadcasting Companies, Inc.*, 881 F.2d 267, 269, (6th Cir. 1989), *cert. denied*, 493 U.S. 1028, 110 S.Ct.

737, 107 L.Ed.2d 755 (1990); *Blue Mountain Forest Association v. Town of Croydon*, 119 N.H. 202, 205, 400 A.2d 55, 57 (1979); *Borough of Matawan v. Monmouth County Board of Taxation*, 51 N.J. 291, 299, 240 A.2d 8, 12–13 (1968).

■ The most significant modification made by the 1995 amendment changed the most equivocal language of the anti-SLAPP statute. Specifically, Public Law 1995, ch. 386, replaced the requirement that a party's petitioning activity not amount to "tortious conduct" with the requirement that such activity not constitute sham petitioning. The amendment defines "sham petitioning" in accordance with the test articulated by the Supreme Court in *Professional Real Estate Investors*. We are of the opinion that by adopting the sham petitioning definition, the General Assembly intended to remove the ambiguity inherent in the 1993 statute by defining what it intended by the term "tortious conduct."

■ Our conclusion in this regard is consistent with precedent as well as with the legislative purpose set forth in § 9–33–1. In *Cove Road*, we emphasized that "the right to petition governmental bodies for the redress of grievances is 'among the most precious of the liberties safeguarded by the Bill of Rights.'" 674 A.2d at 1236 (quoting *United Mine Workers of America v. Illinois State Bar Association*, 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426, 430 (1967)). The Supreme Court has long recognized the "preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment" and that it is "in our tradition to allow the widest room for discussion, the narrowest range for its restriction." *Thomas v. Collins*, 323 U.S. 516, 530, 65 S.Ct. 315, 322–23, 89 L.Ed. 430, 440, *reh'g denied*, 323 U.S. 819, 65 S.Ct. 557, 89 L.Ed. 650 (1945). By enacting the anti-SLAPP statute, the General Assembly intended to secure the vital role of open discourse on matters of public importance, and we shall construe the statute in the manner most consistent with that intention. Hence, we reject Hometown's posture that simply by its inclusion of a defamation count in its

complaint against Fleming, it can circumvent the General Assembly's clear design that conditional immunity apply to all legitimate petitioning activity that becomes the subject of a punitive civil claim.

■ The 1995 amendment altered in no way the anti-SLAPP statute's unambiguous intent to protect the "full participation by persons and organizations and robust discussion of issues of public concern" from the "disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." General Laws 1956 § 9–33–1. The amendment evinced no signal or suggestion that the General Assembly intended the protection of petitioning activity afforded under the original statute to be narrower than that provided under the 1995 amended version. Rather, it is our opinion that the General Assembly intended P.L.1995, ch. 386, to clarify and not to cloud the material provisions of § 9–33–2, and that the term "tortious conduct" in the 1993 act is synonomous with the term "sham petitioning" in the 1995 amendment.

### Procedural Nature of Fleming's Motion

■ When the General Assembly enacted the 1995 amendments, the "special motion to dismiss" provision was deleted. Section 9–33–2(c) now provides, "The immunity established by this section may be asserted by an appropriate motion or by other appropriate means under the applicable rules of civil procedure." This alteration was clearly intended to remedy the unworkability of the special-motion clause, which referred to a "preponderance of the evidence" standard and directed the court to "consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." These provisions were at odds with conventional motion to dismiss procedures that limit the trial justice to consideration of the pleadings. *See* Super R. Civ. P. 12(b) & (c). It is clear that the General Assembly intended a hearing justice to consider more than the pleadings in ruling on a motion made pursuant to § 9–33–2, and thus, the designation "special motion to dismiss" was inappropriate. Consequently, we hold

that the "appropriate motion" or "other appropriate means" described in the 1995 amendment would be a motion for summary judgment that will allow the hearing justice to consider information extrinsic to the pleadings. Hence, the motion justice should have considered Fleming's special motion to dismiss as a motion for summary judgment.

### The Trial Justice's Decision

■ In denying Fleming's motion, the justice stated:

"The defendant's reliance on the act limiting strategic or SLAPP suits, so-called, is immediately belied by the very words under which she seeks protection; that is, while plaintiffs' claim against defendant clearly involves petition and free speech, the claim charges that the plaintiffs have been the victims of alleged tortious conduct on the part of the defendant. Even with the aid of defendant's affidavit, when the pleadings are viewed as a whole, the Court cannot rule as a matter of law that the defendant did not engage in tortious conduct toward the plaintiffs. And that has to be separated from the petition and free speech issues.

"The Court is cognizant of the *Noerr–Pennington* doctrine * * * and the defendant's proposed meanings of the words 'course' and 'tortious.' However, as pertains to 9–33–1, the Court finds neither to be applicable or controlling. Because the Court is not satisfied that defendant has demonstrated that she falls within the class of defendants defined in 9–33–2(A), the Court denies the defendant's motion to dismiss pursuant to the Rhode Island anti-SLAPP legislation."

We disagree with the motion justice's analysis of the statute. As discussed *ante,* the *Noerr–Pennington* sham test, incorporated in the 1995 amendment, will control our review of whether Fleming's statements amounted to tortious conduct that would fall outside the protection of the 1993 statute. The fact that Hometown's complaint "charges that the plaintiffs have been the victims of alleged tortious conduct" by Fleming cannot serve as the basis for the motion justice's refusal to grant Fleming's motion.

The mere allegation by a plaintiff that a defendant has engaged in tortious conduct cannot defeat the underlying purpose of the anti-SLAPP statute. The 1993 statute, § 9–33–2(a), by its terms, applied to "any case in which a party asserts that the civil claims * * * against said party are based on said party's lawful exercise of its right of petition or of free speech under the United States or Rhode Island constitutions in connection with a matter of public concern." The patent intent of the statute to protect petitioning activity cannot be reconciled with the motion justice's finding that Fleming is not within the class of defendants contemplated by the act. Fleming's written statements clearly constituted an exercise of her right of petition and free speech within the meaning of § 9–33–2(e). The statements, submitted to an executive body as well as to legislators, were "made in connection with an issue under consideration or review" by DEM and "in connection with an issue of public concern," namely, potential environmental contamination resulting from Hometown's landfill activities.

■■■ We conclude, on the basis of our application of the sham test to Fleming's activities, that the motion justice erred in ruling that she could not "rule as a matter of law that the defendant did not engage in tortious conduct toward the plaintiffs." In her affidavit, Fleming presented detailed averments that her statements were based upon various scientific studies and reports.[1] Hometown submitted no opposing affidavit or other evidence to challenge Fleming's statements but relied solely on the assertions in its pleadings. On the basis of the record before us, it is clear that Fleming did not engage in sham activity that was "objectively baseless in the sense that no reasonable person exercising the right of speech or petition could realistically expect success in procuring [favorable] government action, result, or outcome." Section 9–33–2(a)(1). The anti-SLAPP statute and our holding today are consistent with the independence and individualism that led this state's earliest settlers "to create a free community of seekers after the Truth and a haven for those persecuted elsewhere for their conscientious beliefs," William G. McLoughlin, *Rhode Island, A History*, ch. 1 at 10 (1978), and they resonate with the expression inscribed on the Rhode Island statehouse dome: "Rara temporum felicitas ubi sentire quae velis et quae sentias dicere licet."[2]

Therefore, for the reasons stated above, we grant the petition for certiorari and quash the decision of the Superior Court, to which we remand this matter with our direction to enter summary judgment in favor of the defendant.

FLANDERS, J., did not participate.

---

1. For example, the affidavit stated, *inter alia:*
   "a) With regard to *Paragraph 5* of the letter, the assertions made therein are based on the 'Occurrence, Movement, and Quality of Groundwater at the Hometown Properties Landfill and Vicinity, North Kingstown, Rhode Island' report prepared by the United States Environmental Protection Agency (U.S.EPA) on or about January, 1990, * * * and on Metcalf & Eddy reports dated June 14, 1989, October 2, 1989, December 8, 1989, January 4, 1990, December 20, 1990, September 18, 1990, November 7, 1991, * * * and in [*sic*] a letter dated December 11, 1989 from U.S. EPA to Marilyn Cohen, Director, North Kingstown Department of Planning and Development * * *.
   "b) With regard to *Paragraph 6* of the letter, attached are preliminary assessment and final screening site inspection reports performed for the U.S. EPA by NUS Corporation dated July 24, 1987 and April 13, 1990 * * *. The reports represent completion of the first two of three major stages relative to a federal declaration of a Superfund site."

2. Translated from the Latin: "Rare felicity of the times when it is permitted to think what you wish and to say what you think."