DRS. PASS AND BERTHERMAN, INC.,
Providence Eye Associates, Inc., on
behalf of themselves and all others
similarly situated

v.

NEIGHBORHOOD HEALTH PLAN
OF RHODE ISLAND.

No. 2009–349–Appeal.

Supreme Court of Rhode Island.

Nov. 30, 2011.

Vincent F. Ragosta, Jr., Esq., Providence, for Plaintiff.

Douglas J. Emanuel, Esq., Providence, for Defendant.

Present: SUTTELL, C.J., FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice FLAHERTY, for the Court.

We are called upon to determine whether the defendant, Neighborhood Health Plan of Rhode Island (NHP), violated state law when it compensated optometrists at a lower rate than ophthalmologists for the same, or substantially the same, medical procedures. For the reasons set forth in this opinion, we hold that it did not and we affirm the judgment of the Superior Court.

## I

### Facts & Travel

NHP is a Rhode Island not-for-profit corporation that operates a licensed health maintenance organization (HMO) that provides health insurance coverage to its enrollees. NHP is controlled by its corporate members, which consist of the Rhode Island community health centers and the Rhode Island Community Foundation. NHP voluntarily limits enrollment in its health insurance program to those individuals for whom the State of Rhode Island Department of Health Services (DHS) purchases health care. This population primarily, but not exclusively, consists of Rite Care participants.[1] In its administration of the Rite Care program, DHS contracts with private HMOs that agree to provide comprehensive health services to Rite Care participants. The HMOs are obligated to ensure that each participant has a primary care provider and access to all of the health care services that are included in the benefit package.

Since 1994, DHS has maintained a contractual relationship with NHP to provide healthcare benefits to Rite Care program participants.[2] According to the terms of the contract, DHS remits a monthly "capi-

---

1. Rite Care is a statewide Medicaid managed-care program operated by DHS. It is a jointly funded federal and state health-insurance program that pays for medical and health-related services for eligible Rhode Islanders. The primary purpose of Rite Care is to ensure that eligible uninsured Rhode Island citizens have access to healthcare services.

2. During the time period in question, two separate contracts governed the relationship between DHS and NHP. The first contract controlled from July 1, 1998, until December 31, 2004. The second contract became effective on January 1, 2005. The two contracts provided substantially similar terms, and the minor differences between them do not affect the outcome of this dispute.

tation payment" to NHP on behalf of each member of NHP enrolled under the state plan. DHS makes the capitation payment to NHP whether or not the member receives any medical services during the period covered by the payment. Distilled to its essence, the capitation payment is an insurance premium. Each month, DHS conveys the capitation payments via wire transfer to NHP's operating bank account. Once the transfer of funds is completed, NHP immediately shifts most of the payment into higher-yield investment accounts. NHP then uses its investment accounts to fund a number of "controlled disbursement accounts" for the payment of service-related expenses, such as claims, pharmacy benefits, or administrative costs. The disbursement accounts are funded daily, based on projected needs.

It is significant that each of the aforementioned financial accounts is held solely in NHP's name, and each is under NHP's exclusive control. NHP freely transfers and spends the money in its accounts without consulting with or receiving input from DHS. NHP recognizes the money it receives from DHS as revenue in its financial statements, audits, and tax returns. Furthermore, the contract between DHS and NHP insulates the state from either primary or secondary liability for NHP's sundry financial obligations. Specifically, the agreement provides that the "State shall bear no liability (other than liability for making payments required by this Agreement) for paying the valid claims of Health Plan subcontractors, including providers and suppliers * * *."

In return for the capitation payments, NHP provides medical benefits to its enrollees. NHP accomplishes this goal by entering into separate medical group specialty services agreements ("participating provider agreements") with medical professionals and physician groups, including, pertinent to this appeal, optometrists and ophthalmologists.[3] The participating provider agreement is a contract between NHP and the provider whereby the provider agrees to perform particular "covered services" in exchange for reimbursement at NHP's specified rate. When a provider treats a NHP member, the provider submits a claim to NHP, which pays the provider from one of its disbursement accounts.

The last facet of this triangular arrangement is the relationship between NHP and its individual enrollees. The state conducts enrollment activities for Rite Care-eligible citizens and provides NHP, on a daily basis, with a list of newly enrolled members. NHP is contractually obligated to enroll any eligible Rite Care beneficiary who selects or is assigned to it, and only the state may disenroll a Rite Care participant from the health plan. Nonetheless, as its participating provider agreements set forth, the "Certificate of Coverage" issued to NHP enrollees is "the document(s) issued to a Member by NHPRI which entitle the Member *to have NHPRI pay for the Member's Covered Services.*" (Emphasis added.)

For most of its history, NHP reimbursed optometrists and ophthalmologists

---

**3.** "Ophthalmologists are medical doctors with specialized training in the diagnosis and treatment of eye diseases and disorders * * * Ophthalmologists are licensed to prescribe drugs, glasses, and contact lenses. They are also trained and licensed to perform eye surgery." *Having Your Eyes Examined, in* American Medical Association Family Medical Guide 1028 (4th ed. 2004). "Optometrists are health professionals who are trained and licensed to diagnose and treat vision problems and to prescribe glasses and contact lenses. Optometrists are not MDs and are not licensed to perform eye surgery. In some states they are licensed to treat some eye diseases and prescribe certain drugs, such as eyedrops." *Id.*

at the same rate for performing the same services. However, when NHP began serving a new population of enrollees designated as "Children with Special Needs," NHP determined that its then existing network of ophthalmologists was inadequate to serve the needs of this new population. NHP concluded that the only way it could persuade more ophthalmologists to participate in its health plan was to increase its reimbursement rates for them. Therefore, beginning on November 1, 2002, NHP reimbursed ophthalmologists at a different, higher rate than the rate paid to optometrists.

The optometrists contended that this differential reimbursement violated state law, arguing that the law required that optometrists and ophthalmologists be compensated at the same rate for the services in question. Under Rule 23 of the Superior Court Rules of Civil Procedure, they brought an action in the Superior Court on behalf of all optometrists who had entered into participating provider agreements with NHP during the period that the differential reimbursement policy was in effect.[4] On February 18, 2008, the Superior Court certified the class of optometrists pursuant to Rule 23(a) and (b)(3).[5] In July 2008, Optometrists and NHP filed cross-motions for summary judgment. On May 5, 2009, a justice of the Superior Court found that there were no genuine issues of material fact, and that summary judgment was appropriate to resolve the matter.

After a lengthy analysis, the motion justice concluded that NHP did not violate G.L. 1956 § 5–35–21.1(b), as amended by P.L. 1997, ch. 216, § 1, as it existed during the relevant period because NHP paid for the ophthalmologists services using private, rather than public, money. He reasoned that the statutory antidiscrimination provision applied only to expenditures of public funds. Accordingly, the motion justice granted summary judgment in favor of NHP and denied summary judgment for the optometrists. The optometrists timely appealed to this Court from the entry of summary judgment in favor of NHP.

## II

### Arguments of the Appellants

Before this Court, the optometrists advance two arguments. First, they contend that the hearing justice erred when he concluded that the money paid to the optometrists and ophthalmologists by NHP were private, not public. Second, they maintain that because the contract between DHS and NHP "called for the expenditure of public funds," then any variance between the reimbursement rates for optometrists and ophthalmologists violated the provisions of § 5–35–21.1(b).

## III

### Standard of Review

■ "This Court reviews *de novo* a trial justice's decision granting summary

---

4. Rule 23(a) of the Superior Court Rules of Civil Procedure provides:
   "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

5. The Optometrists are a certified class of "all optometrists and optometric practices or groups which participated in Neighborhood Health Plan of Rhode Island and provided optometric services to its members at any time between November 1, 2002 and July 14, 2005, inclusive." The class is limited to this period of time because NHP resumed compensating optometrists and ophthalmologists at the same rate on July 15, 2005.

judgment." *Trust of McManus v. McManus,* 18 A.3d 550, 552 (R.I.2011) (quoting *Lynch v. Spirit Rent–A–Car, Inc.,* 965 A.2d 417, 424 (R.I.2009)). "This Court will affirm summary judgment if, when viewing the evidence in the light most favorable to the nonmoving party, 'there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.'" *Id.* (quoting *Lynch,* 965 A.2d at 424). Additionally, the resolution of this matter necessarily requires us to interpret statutory language. "[A]s the final arbiter on questions of statutory construction," this Court reviews such questions *de novo.* *D'Amico v. Johnston Partners,* 866 A.2d 1222, 1224 (R.I.2005).

## IV

### Analysis

### A. Applicable Law

There seems to be little dispute that the version of § 5–35–21.1 that was in force during the pertinent period lies at the heart of this matter. The history of this statute has been particularly fluid, and the numerous amendments to it are relevant to this Court's determination of the rights of the parties.

In 1988, the General Assembly enacted § 5–35–21.1, a "freedom of choice" statute that allowed healthcare plan beneficiaries to choose between optometrists or physicians for their eye care. The original statute provided:

"Any contract providing for health care benefits, which calls for the expenditure of private or public funds, for any purpose involving eye care, which is within the scope of the practice of optometry, shall provide the recipients and/or beneficiaries the freedom to choose within the participating providing panel either an optometrist or physician to provide such eye care. This provision shall be applicable whether or not the contract is executed and/or delivered in or outside the state, or for use within or outside of the state by or for any individuals who reside or are employed in the state." P.L.1988, ch. 245, § 2.

In 1994, the General Assembly amended the "freedom of choice" statute by adding the following caveat:

"Provided, however, where such contracts call for the expenditure of *public funds,* for any purpose involving eye expenditure of *public funds* [*sic*], for any purpose involving eye care, there shall be no discrimination as to the rate of reimbursement for such health care whether provided by a doctor of optometry or physician providing like services." P.L.1994, ch. 436, § 1 (emphasis added).[6]

This "antidiscrimination" amendment was codified as § 5–35–21.1(b).

In 1995, the General Assembly revamped the statute again to allow "beneficiaries the choice of having their eyeglasses or lens prescription filled by either a physician, an optometrist or an optician." P.L.1995, ch. 253, § 1 (explanation by legislative counsel).[7] This amendment was codified as § 5–35–21.1(c). In 1997, the

---

6. We quote the statute exactly as it appeared as amended in 1994, which includes an apparent typographical error in lines two and three.

7. Public Laws 1995, ch. 253, § 1, stated:
   "Provided, however, where such contracts call for the expenditure of public funds involving medicaid and RIte Care for any purpose relating to eyewear, and as it pertains to Opticianary, the distribution, dispensing, filling, duplication, and fabrication of eyeglasses or optical prosthesis by opticians as defined in R.I.G.L. 5–35–1, there shall be no discrimination as to the rate of reimbursement for such health care provided by an optician for like services as rendered by other professions pursuant to this section."

General Assembly amended subsection (c) to include expenditures of public funds for "medicare or supplemental coverage."[8] Later that same year, the General Assembly further amended subsection (c) to "allow providers, including opticians, of the opportunity to apply for participation in contracts involving the expenditure of public funds." P.L.1997, ch. 216, § 1 (explanation by legislative counsel).[9]

In 2005, the General Assembly tinkered with § 5–35–21.1 one final time.[10] The amendment interpolated the words "or private" each time the phrase "public funds" appeared in the statute. Following the enactment of the 2005 amendment, § 5–35–21.1 in its entirety, has provided as follows:

"(a) Any contract providing for health care benefits, which calls for the expenditure of private or public funds, for any purpose involving eye care, which is within the scope of the practice of op-

tometry, shall provide the recipients and/or beneficiaries the freedom to choose within the participating provider panel either an optometrist or physician to provide the eye care. This provision shall be applicable whether or not the contract is executed and/or delivered in or outside of the state, or for use within or outside of the state by or for any individuals who reside or are employed in the state.

"(b) Where the contracts call for the expenditure of public *or private* funds, for any purpose involving eye expenditure of public *or private* funds, for any purpose involving eye care, there shall be no discrimination as to the rate of reimbursement for the health care, whether provided by a doctor of optometry or physician providing similar services.

"(c) Where the contracts call for the expenditure of public *or private* funds

---

**8.** Accordingly, subsection (c) of G.L.1956 § 5–35–2.1 read as follows:

"Provided further, however, where such contracts call for the expenditure of public funds involving Medicaid and RIte Care, *medicare or supplemental coverage* for any purpose relating to eyewear, and as it pertains to Opticianary, the distribution, dispensing, filling, duplication and fabrication of eyeglasses or optical prosthesis by opticians as defined in section 5–35–1, there shall be no discrimination as to the rate of reimbursement for such health care provided by an optician for like services as rendered by other professions pursuant to this section." P.L.1997, ch. 215, § 1 (emphasis added).

**9.** Following these three successive revisions, § 5–35–21.1(c) says as follows:

"Provided further, however, where such contracts call for the expenditure of public funds involving Medicaid and RIte Care, for any purpose relating to eyewear, and as it pertains to Opticianary, the distribution, dispensing, filling, duplication and fabrication of eyeglasses or optical prosthesis by opticians as defined in section 5–35–1, all

such health plans or contracts shall be required to notify by publication in a public newspaper published within and circulated and distributed throughout the state of Rhode Island, to all providers, including but not limited to opticians, within the health plan's or contract's geographic service area of the opportunity to apply for credentials, and further, there shall be no discrimination as to the rate of reimbursement for such health care provided by an optician for like services as rendered by other professions pursuant to this section. Nothing contained herein shall require health plans to contract with any particular class of providers." P.L.1997, ch. 216, § 1.

**10.** Although not effective during the relevant period, the 2005 amendment illuminates the meaning of the statute as it existed at the time this dispute arose. The version of § 5–35–21.1 in effect from November 1, 2002, until July 14, 2005, is identical to the 2005 version, except for the underscored words *"or private."* For the sake of simplicity, this opinion will refer to the various sections of the statute by the subsection designations that the General Assembly assigned in 2005.

involving Medicaid and RIte Care, Medicare, or supplemental coverage for any purpose relating to eyewear, and as it pertains to Opticianary, the distribution, dispensing, filling, duplication and fabrication of eyeglasses or optical prosthesis by opticians as defined in section 5–35–1, those health plans or contracts are required to notify by publication in a public newspaper published within and circulated throughout the state of Rhode Island, to all provider, including, but not limited to, opticians, within the health plan's or contract's geographic service area, of the opportunity to apply for credentials, and further, there is no discrimination as to the rate of reimbursement for health care provided by an optician for like services as rendered by other professions pursuant to this section. Nothing contained in this chapter shall require health plans to contract with any particular class of providers." P.L. 2005, ch. 303, § 1 (emphasis added).

## B. Interpreting the Statutory Language

■ Optometrists argue that the motion justice erred when he concluded that the funds that NHP used to pay for optometric services were private, rather than public, funds. "When we construe a statute or ordinance, 'our ultimate goal is to give effect to the purpose of the act as intended by the Legislature.'" *Ryan v. City of Providence*, 11 A.3d 68, 70–71 (R.I. 2011) (quoting *D'Amico*, 866 A.2d at 1224). Nonetheless, "[i]t is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordi-

nary meanings." *Id.* at 71 (quoting *Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223, 1226 (R.I.1996)). "This is particularly true where the Legislature has not defined or qualified the words used within the statute." *D'Amico*, 866 A.2d at 1224 (quoting *Markham v. Allstate Insurance Co.*, 116 R.I. 152, 156, 352 A.2d 651, 654 (1976)).

■ During the relevant period, the statute provided that where contracts "call for the expenditure of *public funds* * * * for any purpose involving eye care, there shall be no discrimination as to the rate of reimbursement for the health care, whether provided by a doctor of optometry or physician providing like services." Section 5–35–21.1(b), as amended by P.L.1997, ch. 216, § 1, (emphasis added). The phrase "public funds" is not a defined term, either under this statute or any of the laws of Rhode Island. However, it is clear that elsewhere in the General Laws the phrase "public funds" is tied to payments made by either the state itself or by its agents.[11] This meaning is consistent with the common sense, dictionary definition of "public" with respect to expenditures. *See* Webster's Third New International Dictionary of the English Language 1836 (1971) ("authorized or administered by or acting for the people as a political entity"). Moreover, this reading of the phrase maintains the internal consistency of the statute, which explicitly distinguishes "public funds" from "private funds" in subsection (a). Ambiguity exists only when a word or phrase in a statute is susceptible of more than one reasonable meaning. *See Unistrut Corp. v. State Department of Labor and Training*, 922 A.2d 93, 100 (R.I.2007).

---

11. *See, e.g.,* G.L.1956 § 37–2–4 ("This chapter shall apply to every expenditure of public funds by any state governmental entity * * *."); G.L.1956 § 17–25–29 (discussing the disbursement of "public funds" from the state treasurer and the state general fund during elections); G.L.1956 § 45–32.1–5 ("Public funds may be used by a community, a public corporation, or a development agency to carry out its purposes under this chapter * * *.").

In our opinion, the statute at issue is not ambiguous.[12]

## C.  State Action Analysis

■ NHP is not an agency or department of the state, and based on our review of the undisputed facts, we agree with the motion justice that NHP cannot otherwise be considered a state actor.  In reaching this conclusion, we are persuaded by the United States Supreme Court's analysis in *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982).  There, the Court held that a nursing-home facility was not a state actor under the Fourteenth Amendment, even though it was subject to significant state regulation and received substantial funding from the state.  *See id.* at 1011, 102 S.Ct. 2777.  The Court held that to sufficiently demonstrate that the actions of a private party amounted to state action, the complaining party must show "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself."  *Id.* at 1004, 102 S.Ct. 2777 (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)).  State action will be found "only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains."  *Id.* "[A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."  *Id.* Mere approval of, or acquiescence in, the private party's actions is insufficient.

*See id.* at 1004–05, 102 S.Ct. 2777.  Alternatively, state action is present "if the private entity has exercised powers that are 'traditionally the exclusive prerogative of the State.'" *Id.* at 1005, 102 S.Ct. 2777 (quoting *Jackson,* 419 U.S. at 353, 95 S.Ct. 449).

Providing medical insurance is not "traditionally the exclusive prerogative of the state," and, in our opinion, the record does not support the conclusion that either a "sufficiently close nexus" exists between NHP and the State or that the influence of DHS was coercive to a degree that would transform NHP into a state actor.  DHS and NHP were parties to what is essentially an insurance contract.  Although there can be no dispute that the money was public in nature at the time of transfer from DHS to NHP, it is our opinion that once DHS wired the capitation payments to NHP's operating account, that money ceased to be public.  NHP's operating, investment, and disbursement accounts are held solely in NHP's name, and the state had no control over the money once it deposited it into those accounts.  Indeed, NHP recognized that money as revenue and freely transferred, invested, and spent it on a daily basis without ever consulting DHS. NHP used its various disbursement accounts to satisfy a variety of obligations, including reimbursing medical service providers such as optometrists and ophthalmologists.

Furthermore, DHS was not a party to the participating provider agreements between NHP and its medical-service providers.  It had no role in selecting which providers NHP would choose to contract

---

12.  Contrary to the argument of the optometrists, this interpretation would not render the statute meaningless or absurd prior to the 2005 amendment.  *See, e.g., Brennan v. Kirby,* 529 A.2d 633, 637 (R.I.1987) ("A statute or enactment may not be construed in a way that would attribute to the Legislature an intent

that would result in absurdities or would defeat the underlying purpose of the enactment * * *.").  The statute would have applied to any direct expenditure by DHS, or any other agency of the state, with respect to optometric health care services.

with or in setting the reimbursement rates for particular services. Beyond the fact that NHP was contractually required to provide specified medical benefits to enrollees, the state had no authority to direct how NHP used its resources.[13] The mere fact that NHP entered into the provider agreements to satisfy its contract with DHS did not transform either the agreements, or the payments made under them, into state action. The insurance contract speaks for itself on this point: "The State shall bear no liability * * * for paying the valid claims of Health Plan subcontractors, including providers and suppliers * * *." Similarly, DHS's function as the state agency responsible for enrolling Rite Care-eligible citizens is minimal; it does not in any way rise to the level of encouragement or coercion necessary to make NHP an arm of the state.

In short, the relationship between DHS and NHP is not any different from that of many contractors performing services for the government. *Rendell–Baker v. Kohn*, 457 U.S. 830, 840–43, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (holding that when a private school received extensive state funding and was subject to pervasive state regulation there was no state action because the school's decisions were not compelled or influenced by the state). It bears little resemblance to the "symbiotic relationship" that courts have found characterizes state action in other circumstances involving private entities. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (holding private party's "joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a 'state actor' for purposes of

the Fourteenth Amendment"); *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 724, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (finding state action when a private lessee engaged in racial discrimination at his restaurant, which was located in a publicly owned building leased from a state parking authority, and who's profits were "indispensible elements" in the government agency's financial success). Furthermore, similar to the United States Supreme Court's holding in *Blum*, the mere fact that NHP receives public funds is insufficient to make it a state actor. *See Blum*, 457 U.S. at 1011, 102 S.Ct. 2777; *Rendell–Baker*, 457 U.S. at 840, 102 S.Ct. 2764. Although not squarely addressing the same issue, these decisions accord with our cases holding that the construction of buildings for private corporations with the aid of public money did not constitute "public works." *See Rhode Island Building and Construction Trades Council v. Rhode Island Port Authority and Economic Development Corp.*, 700 A.2d 613, 616 (R.I.1997); *James J. O'Rourke, Inc. v. Industrial National Bank of R.I.*, 478 A.2d 195, 198 (R.I.1984).

Optometrists cite to the Commonwealth Court of Pennsylvania's decision in *Lukes v. Department of Public Welfare*, 976 A.2d 609 (Pa.Comm.Ct.2008), as persuasive authority to support their argument that NHP pays participating providers with public money. In *Lukes*, an intermediate Pennsylvania appellate court found that the provider agreements between a Medicare managed care program operated by the University of Pittsburgh Medical Center and its medical-service providers were subject to disclosure under the Pennsylva-

---

**13.** Any obligation on the part of NHP to provide particular services, or to refrain from providing particular services, is contractual and has nothing to do with the nature of the funds expended by NHP. Thus, the optometrists' argument that "NHPRI is prohibited from funding abortions because the funds with which it would pay providers * * * are public funds" and that "Rhode Island's receipt of federal Medicaid funding could be jeopardized" if we conclude otherwise is both hyperbolic and without merit.

nia public records act. *See id.* at 624–26. The court concluded that the agreements were public records because they reflected a "money trail" tracing "the expenditure of public funds for the benefit of Medicaid beneficiaries." *Id.* at 625. Thus, *Lukes* is primarily concerned with a public-records question not before this Court, and we decline to accept its reasoning.

▆ We do not agree with the overbroad construction of the statute that the optometrists urge us to embrace. In essence, they ask us to hold that if the state pays an entity, and that entity uses the money to pay for optometric medical services, then that money is an "expenditure of public funds for any purpose involving eye care." They rest this argument on the assertion that the initial source of the money is public and that NHP has an "involved" relationship with DHS that is of "greater consequence" than relationships NHP maintains with other entities. On the contrary, we find Justice Alito's analogy in *Allison Engine Co.* apt: "[I]f a federal employee who receives all of his income from the Government were asked in a formal inquiry to reveal who paid for, say, his new car or a vacation, the employee would not say the Federal Government had footed the bill." *Allison Engine Co. v. United States ex rel. Sanders,* 553 U.S. 662, 669–70, 128 S.Ct. 2123, 170 L.Ed.2d 1030 (2008). As Justice Alito reasons, "precision is both important and expected" in statutory drafting, and Optometrists, like the Government in *Allison Engine Co.,* rest their argument on an expansive "colloquial usage" that is "not customary." *Id.* at 670, 128 S.Ct. 2123.

▆ Our conclusion is further buttressed by the General Assembly's 2005 amendment to § 5–35–21.1. When the Legislature amends the language of a statute, we generally presume that it intended to change the meaning of the statute and "accomplish some purpose." *Hometown* *Properties, Inc. v. Fleming,* 680 A.2d 56, 62 (R.I.1996). Here, the preamendment version of the law limited the scope of the antidiscrimination provision to expenditures of "public funds." We agree with the motion justice that the most plausible inference to be gleaned from the legislation trail is that the General Assembly amended the law to expand the scope of the antidiscrimination provision to include expenditures by private entities like NHP, which previously had not been governed by the statute. In 1988, the General Assembly included the phrase "public or private funds" in the freedom of choice statute. However, in 1994, it chose to include only the phrase "public funds" in the antidiscrimination amendment. In light of this history, it is our opinion that the General Assembly did so intentionally, and that the purpose of the 2005 amendment was to ensure that optometrists and ophthalmologists would be paid equally for similar services from that point forward.

### Conclusion

The judgment of the Superior Court is affirmed. The record in this matter is remanded to the Superior Court.

Justice GOLDBERG did not participate.

Justice ROBINSON, concurring.

Although I concur in the majority's opinion, I write this brief separate opinion simply to record the fact that I have found this to be an exceedingly close case. Credible arguments have been made by both parties, and there is a dearth of genuinely "on point" precedent.

Having said that, I realize that cases have to be decided; and I believe that the view expressed in the opinion of the Court is the better view. I think that the Court's reading of the term "public funds" in the statute at issue is, upon due reflection, the only truly logical one.

I conclude this brief concurring opinion by quoting an astute observation that Justice Louis D. Brandeis of the United States Supreme Court once made to his colleague Justice Robert H. Jackson. Reflecting upon the fact that his role as an arbiter of the law required him to make a decision when the correct answer was often far from apparent, Justice Brandeis commented as follows:

"[T]he difficulty with this place is that if you're only fifty-five percent convinced of a proposition, you have to act and vote as if you were one hundred percent convinced. * * * You've got to decide the case one way or the other. Therefore the result oftentimes doesn't reflect the residue of doubt that remains in the minds of the men [and women] who've decided it." Melvin I. Urofsky, *Louis D. Brandeis: A Life* 836 n. 474 (2009).

I am in full agreement with that felicitously worded observation.

Having set forth these few comments, I conclude by reiterating that I concur in the opinion of the Court.